The first case for argument this morning is 18-1-221, Nalpropion Pharmaceuticals v. Actavis. Mr. Ball, whenever you're ready. If it may please the Court, there are three patents that are at issue in this appeal. I'd like to focus today on one of those patents, and that is the 195 dissolution profile patent, and the sole issue on appeal with respect to the 195 is whether the District Court erred in finding adequate written description for Claim 11, a claim which was added by amendment years after the application was filed. Can I ask you a question about, maybe I'm confusing this with something else, but my recollection is that the District Court, this is kind of a legal question, the District Court found that disclosing one of a range was sufficient for written description. And I assume you take issue with that. So, you know, there's, case law is a little thin on the written description area. We just haven't had that many cases. But do you, isn't that what the District Court concluded or based its conclusion on? That was one of the things the District Court based the conclusion on, which, if I understand the question, the District Court was referring to the dissolution data in Example 3, Table 10, which the testimony from plaintiff's expert was that that dissolution profile fell within the scope of the claim, even though there was this open issue about whether or not that was obtained using the proper USP Apparatus 2 dissolution method as claimed as opposed to the unclaimed USP Apparatus 1. But leaving that second issue aside, we certainly take issue with the fact that the entire range of dissolution values could be supported by this single dissolution profile. And, in fact, I don't believe the dissolution profile is a result. This is a method of treating obesity which consists of steps. It's the steps of orally administering two compounds in specific amounts in sustained release form, administered twice daily. Each of those is steps. You have to describe those steps to describe the invention. The dissolution profile is a result. That's not a step. So why is that relevant to satisfying the written description requirement when the steps have adequately been described? I understand the question. So the dissolution profile here is an in vitro dissolution profile. It's not the inherent result of simply taking the tablet and saying it dissolves in the patient in a certain amount of time. There are no steps, other steps in the claim that would create one dissolution profile versus another. The steps in the claim are all recited in the patent, and therefore the written description requirement is met. The dissolution, the particular dissolution profile is absolutely a limitation of this claim, and it's not an inherent feature. There were existing tablets that were Is that a step? The method claim? Is the dissolution profile a step in the method claim? The dissolution profile is defining what must be a property of the tablets that are given. Those tablets have to be characterized by meeting this certain dissolution profile. In other words, according to this USP standard, apparatus two paddle method, when those tablets are placed into the vessel, the in vitro vessel, and measured, they must deliver this rate. And the testimony What makes that happen in terms of a particular step, other than the steps that are already recited? What makes that happen is the way the tablet is engineered. It has to be constructed with sustained released excipients in a very precise way. The testimony was that it took over a year to get just that precise dissolution profile that was claimed in this patent. This isn't a claim to formulating a capsule or a tablet that dissolves in a certain way. This is a method of treatment of obesity. And that method of treatment of obesity was in the 626 patent, the other patent that's at issue in this case. That was prior art against this. So the treatment of obesity was not invented in the 195 patent. This came years later and it was directed That might mean that the claim is invalid. Well, we certainly believe the claim is invalid, but this came years later and the sole contribution that is being claimed in this 195 is about that dissolution profile. Regarding the at least 99% dissolution range over eight hours, and you take issue with that, so at least 99% means that less than 1% remains. Is less than 1% an effective amount? There was no testimony certainly on this at trial whether or not 1% is an effective amount or not. Less than 1%. Less than 1%. But the reality is this patent simply says nothing at all about a range of values at eight hours. There is a single data point for the at least 99% at eight hours. That is in Table 10 of Example 3, and it says 99% exactly. Now, six years after the patent was filed, maybe it became important for the patentee to have a range of values of above 99%, but that's just not in the application as filed, not even in passing. It is in Note 58-18 in the Blueberry. You say the district court, quote, recognized in its questioning ellipsis the inconsistent and random selection of the upper bounds of one and two-hour ranges from these passages, neither made any sense nor conformed with normal scientific practice. Those were questions. How can you claim the district court's new conclusions by asking questions? Well, so the district court, and this relates to the issue from Column 13 of the patent where there's disclosures of upper endpoints where there's four different combinations that can be used for the one and two-hour upper endpoints. And the question was asked by the district court judge to Dr. Treacy, plaintiff's expert, does it make any sense to mix and match and combine these in that way? And Dr. Treacy's explanation, I mean, I'll submit was less than compelling, and he just simply said, well, there's pharmacokinetics involved, and it may be the case, but he certainly didn't say that there was a rhyme or reason for that. So you're citing what he said. How does the district court's question equate recognition, i.e. a holding? Quite obviously the district court did disagree with us on that because ultimately the district court found that there was support for the upper endpoint because the district court didn't apply the Blasemarks Law from In re Russia, Fuchikawa v. Watson and this court's precedent that requires, in order to get this question, though, my question was, how does that questioning equate recognition? As you say, it came out the other way. So I, you know, frankly, it doesn't. You can't say the court conceded either. I don't like those words. The court obviously did not concede that there would have been no rhyme or reason to select those values because he so held in the opinion, our point being that there was never offered in this court's opinion any reason that a person of ordinary skill in the art looking at this application would have had the appropriate Blasemarks to make this combination together with the multitude of other selections that needed to be made to get this dissolution profile. The court disagreed with you there, too. The court certainly disagreed with us because he found adequate written description for the claim. But we submitted it was error, legal error on multiple grounds. One, by not even applying the correct legal standards, looking for Blasemarks. What this application really discloses is in Table 5 of Example 2, you've got some data. And the court went to the 15 percent HPMC data, plucked two data points from that curve, and used those to support the lower end point. Even though that was USP-1 data, not USP-2, and even though the unrebutted testimony was that the USP-1 and USP-2 data are not comparable and produce different results. And is there a difference between the 10 percent and the 15 percent HPMC in that table? There is a difference, and the testimony was that none of those fell within the scope of the claim, but I think both experts said that the 10 percent was too fast of release to qualify as sustained release. But there was nothing articulated that would point specifically and say, as an integrated whole, this profile, this dissolution profile, where you need at least 99 percent at eight hours. Even though there was no range in the patent at all. This was just invented out of whole cloth in the amendment to say, I'm going to take this eight-hour data from Table 10, even though there's no range, I'm going to combine it with two data points from Table 5, and reject all the other data points, and then I'm going to take this aggregation of upper bounds from Column 13, and with no apparent... The district court credited Dr. Treacy's testimony regarding how a person of color could understand the dissolution methods. The district court credited the testimony, but the testimony was not ever pointing to blaze marks saying, Dr. Treacy committed, I'll submit, the same error that the district court did, which was simply look at the claim and work backwards, using the claim, the amended claim, as a roadmap to go hunting for support in the specification. There is no way that a person of ordinary skill in the art, without foreknowledge of this amended claim that did not exist in the application, would have been directed to select those two data points from the 15 percent HPMC tablet, selectively pluck them out, reject the remainder of that profile, because it didn't fall within the scope of Claim 11. So this claim was amended to avoid the prior art by adding a result, but not a step to achieve that result. This claim was amended. The entire, in the application as filed, Your Honor, the original claims related to pharmacokinetic parameters, in vivo parameters, there wasn't a dissolution profile claim. The dissolution profile was presented for the very first time by amendment. You can read this patent, start to finish, and you'll never find these ranges. You'll never find a discussion of ranges of 39 percent to... But the question is, why was the amendment to overcome a WD rejection or an obviousness rejection? There was no testimony about that, but my understanding is it just became desirable for the patentee to seek protection for a dissolution profile. That's because controlling obesity with naltrexone and bupropion was in the prior art. That was in the prior art. So what they were trying to do was carve out a very narrow niche around their approved drug product, Contrave, to very narrowly try to capture the dissolution profile for the Contrave drug product, which did not even exist when this was put in. So that is the reason this was put in, was to try to get, for the very first time, a claim to a dissolution profile. Can I move you just a quick... I know you weren't calling forward the obviousness rejection in Claim 1 of 111 patent, but let me ask you about that. Is your argument on obviousness and what the prior art teaches necessarily predicated on our thinking that it's sufficient to disclose decreasing sugar and carbohydrate cravings? Is that, in your view, equivalent to trying to achieve weight loss, and is that necessary? Or is your view that the prior art also disclosed not just the diminishing cravings, but also the weight loss that accompanied that? For the 111, I would say all of that is irrelevant because it's a Composition of Matter patent, and it's all but anticipated by Claim 19 of the O'Malley patent, even though we argued it as obviousness. The intended result for treating obesity is not a limitation of the 111. So that one stands apart a little bit. Is decreased increase the same as decreased? Well, and that goes to the 626. So the essential answer is we would say yes. And the question there was, O'Malley used the same combination, sustained-release naltrexone and bupropion, for preventing weight gain. For decreasing weight gain when you stop smoking. Yes, for inhibiting the weight gain, and that was because of appetite control. That was because it causes you to eat less, have less hunger cravings, and the necessarily in an obese population is going to lead to the same appetite control and reduced cravings. I see that I'm well into my rebuttal time, so I'll rest unless there's further questions. Good morning. Good morning. May it please the Court. The claims were amended to remove the reference to standard dissolution test and replace it with a specific reference to the paddle method. What does that mean to us? Well, I think what it means for purposes of infringement, you need to use that specific paddle method. But if you look in terms of the 112 issues, it was the patent is clear that USP-1 and USP-2 are equivalent to one another. Our experts testified that they're equivalent. And Dr. Mayerson effectively said that they were equated to one another. And in addition, another important fact is that in that amendment, when asked for support for the dissolution ranges, the inventors pointed to Table 5, which actually uses USP-1. So when you read the prosecution history as a whole, one skill dot would understand that for purposes of 112, the differences in the paddle are not substantial. Regarding validity, these references pretty much show Naloxone and weight loss. So, Your Honor, if I understand your question correctly, we're turning to the obviousness issues. I think there's a yes. Well, Your Honor, I think the most important thing about the obviousness is that we need to look at the art as a whole. And what is unrefuted and not denied by activists is that there were numerous failures in the obesity art at the time of the filing. In fact, there were only three approved products for obesity as of 2003. One was Fen-Phen, which I think everyone knows was withdrawn by then. The other two products, one was withdrawn shortly thereafter, and the third one had significant side effects. And the reason that this is important is that that's why the district court said that the defendants were using Hindsight. Because in this art, when there's all these failures, you need to use Hindsight to pick that combination. When you look at the references themselves, when you look at them closely, this is what you'll find. You've got the Jane reference, which talks about bupropion having a modest, at best, weight loss effect. In fact, if you look at the data on bupropion, the average weight of the — Excuse me. How about Dante?  So Dante, Your Honor. So O'Malley, Dante, and Bernstein are sort of in the same bucket. None of them were directed to treating obesity. So O'Malley was to nicotine withdrawal. But this is a composition. Right. The key issue there, Your Honor, is that the actual disease state that the patient has is very important. Because the neurochemistry of each one of those patients is different. A person who has smoking cessation issues may not have the same thing going on either in their neural system or otherwise than a person who is obese. And, in fact, a person who has smoking cessation could be skinny as a rail and not have any obesity issues. The same thing for Bernstein, which goes to the carbohydrate craving. Judge Prost, you raised that before. The testimony on the record that was credited by the district court from Dr. Seeley is that they're not the same. That carbohydrate craving doesn't necessarily mean weight loss. So I think when you look at the record, if you look as O'Malley, Dante, and — But, Dante, doesn't Dante provide specific examples and talk about weight loss? Saying it refers to one obese man and no longer craves sweets and reported losing about 10 pounds a week. Then a woman, I think, cravings – diminished her cravings and she lost 30 pounds in three weeks. So there's a reference there that correlates the sort of diminishment of cravings to a weight loss, right? Well, I would disagree, Your Honor. First of all, examples – And you disagree with what I said the reference teaches? They don't correlate – well, they talk about weight loss, but the only testimony on examples two and three was from our expert. Defendants' experts didn't rely on example two and three at all. And what our expert said is that those patients were very complicated. And if you look at what went on with those patients, what it effectively says is that the carbohydrate craving came on as a result of the other drugs they were taking. So they were taking some other antidepressant. But you have several references here. And why does testimony control here when we can simply read the references? Because as our expert explained, these patients are very – the disease states that they have are very different and very specific. So I don't think that as a layperson you can look at these references and say, well, I know exactly what's going on. We had medical doctors – both sides had medical doctors take the stand, opportunity to provide testimony on direct and cross. The fact of the matter is the district court credited our expert and did not credit activist experts, even including testimony regarding examples two and three of Dante. What about that fax? Yeah, the Gatti fax yesterday. Yeah. So the district court got it right. The Gatti fax was in – What the district court in effect said was, well, you don't have anything to back that up. Right. You don't have corroboration. And the case law is pretty straightforward on corroboration. The Finnegan case says you need some corroboration. It's not good enough just to put it in a document without independent corroboration. But it seems to me that even the testimony was sort of waffling. Well, it was waffling. I think the other thing to keep in mind was Gatti seems to say, well, I don't really remember what I did. Exactly. He did not say, I remember treating these patients and this would happen. And, in fact, if you look at the table, the result – so there's six patients in that table. The first four are naltrexone and fluoxetine. The last two are naltrexone and bupropion. And for both, they said one had no effect and the other, the effects were questionable. So even if you were to assume everything came in, that is not enough to say that the combination would be a success. Can I take you back to where you started on written description? I think your first point was that they were substantially equivalent, the two tests, disclosure. Do you have a case in written description where we said disclosure, showing possession of something substantially equivalent, satisfies the written description? Because that's just another leap. And I know the tests may be confusing at times, but is there a case that says that? Yeah. The Lockwood case. That's right. Thank you. The Lockwood case says that, that information that was substantially equivalent could be used to show the support for the written description? The Lockwood case held that you don't show written description by showing something that is obvious. That's correct. It did say that. And I know, Your Honor, you wrote the Lockwood decision, and I've looked at that. But it also has this other secondary issue about whether something is equivalent or not would be allowed to do it. But I agree that. So if you've got a disclosure of a particular test, an absolutely particular test, then you can satisfy written description by saying, well, this is another test, but it's substantially equivalent. I don't know what that means. Maybe functionally resolved? Well, I don't think that they're challenging that the USP2 paddle was not described by the patent. They're not saying that the claim is invalid because of the USP. They're saying that the data that was obtained was not using that particular test. But the patent makes clear that it could be USP1 or an equivalent. So the patent itself opens up the possibility of having an equivalent test satisfy the written description. Well, that's a specification. I mean, but the claim requires a particular test, right? Right. I mean, we're driven by the claim, even if the specification has other tests in it. We've got this test here, right? Infringement is going to be determined by this test. Yes, Your Honor. Right? So does Lockwood say a substantially equivalent test or whatever? I don't remember what was it. Well, I think what the point is, is the question goes back to, well, are the – so let me back up just a little bit on this because we – I want to start from the beginning. And let me ask this question for you, too. Is there evidence that the two tests, dissolution tests, produced the same results? Well, in fact, the district court criticized Dr. Mayerson for not coming forward with that test. He theorized that they would give different results, but he never said that they actually did. They never showed any data. And, of course, it's active as a burden of proof to show, in fact, that they provide different results. And if you look at – Well, that's not – I don't know. That's my question. Right. If you disclose something in the claim that's specific, and then in the spec you use something else, and you've got testimony saying they're substantially equivalent, I'm not clear who's got the burden to show what there. Right? Right. But I think at the end of the day – And do you have positive test, affirmative test ones saying they're the same thing? Neither side submitted any testing data on that point, Your Honor. So the point is, if you look at the claim, the claim is to a dissolution range. And as the judge pointed out, if you run a dissolution test, you get one point. But, of course, we all know that dissolution tests can vary from test to test, so the inventors have the right to claim the full scope of what they reasonably believe to be their invention. And what they said in that amendment is that, we believe that the claimed invention would have particular dissolution profile. And they based that profile based on data in the patent. And that's all they were required to do. They were required to have data in the patent or something in the patent for those particular numbers. Well, except that was my question to your friend, so maybe you can segue to that, which is the district court seemed to me to depend on the fact that, well, they didn't – the test described in the specification did not have to include the entire range as long as they disclosed one point on that range. And that's all Table 5 or Table 10 at best do, right? They don't disclose the entire range. Right. They don't enclose the entire range for the very reason I just gave, which is that they only provide one point. So you need to have more than one point for a range. So what the district court said, it was reasonable for the inventors to take the 15% dissolution data from Table 5, which was the first time that there was actually sustained release. The testimony from both experts was that the 5 and the 10 were immediate release. So that became the lower range. And they went to the specification where it says the higher range could be, I think it was 70%. And because the data only gives you one point, in order to come up with a range, you have to go somewhere else to develop it, whether it be from a discussion in the specification or other dissolution data. And that's all that the applicants did. And the district court understood that and ruled in our favor. Talk about your less than 1% in the past eight hours, or as I keep saying, your friend, more than 99%. Well, I think, you know, dissolution data, once you get to 99%, it's essentially complete. And that's what the court found. And the claim doesn't say 99 to 100. It says at least 99. And so there was data in the spec that said 99 at eight hours. And so whether 1% is effective or not, we would need to look at other data. I'm not sure dissolution data would provide that information. But what they're trying to do with the dissolution data is describe the sustained release properties of the drug that's being administered. And that was different than the prior art. So this whole bit about 99%, you know, needs to be a range, or I'm not even sure I understand all their argument. The bottom line is that 99% is essentially the same as 100, so it covers 99% or above. And that's the way the claim limitation reads. Absent any other questions, I give up the rest of my time. I would just like to address just a couple quick points that were made there. First of all, the Lockwood case absolutely does not say that something that is substantially equivalent is the same as the invention itself. The holding of Lockwood is directly contrary to that. It says you show possession by showing the invention, including all of its claim limitations, not possession of something that renders that obvious. So you don't show possession of an invention by showing something similar to the invention. And that's the gist of plaintiff's argument as to why the example two data should somehow support this claim. But now as a factual matter, the evidence is that they are not similar. The testimony that was not even considered, or in the district court's opinion by the inventor and 30B6 witness, Dr. Saltero, testified, the inventor of this patent testified, that the results of USP1 and USP2 are not comparable to one another. You started to say it wasn't considered by the court. It's not mentioned in the opinion whatsoever, so there's no indication that the judge did consider this evidence, but it's critical because it goes to the fundamental issue for the written description, which is disclosure of USP1 does not indicate possession of those same values as measured by USP2. And Dr. Saltero said there's no even accepted rule of thumb for converting between USP1 and USP2, and that for Contrave, the drug product, it matters whether you use the USP1 technique or the USP2 technique because you get different results for the very drug that we're talking about here. So that was clear error for the district court judge to either overlook or ignore this testimony, and that's all at appendix 11319 through 11321, the testimony of Dr. Saltero. Then very quickly, the counsel said that a single data point doesn't support a range. We agree. So how can a disclosure of 99% exactly support a range of 99 and above? It may be a small range, but it is still a range. A very small range. It is still nevertheless a range, and one which was not in the possession and not even mentioned in the patent as originally filed. Okay. Thank you. We thank you. The case is submitted.